**Rideout v. Hershey Medical Center**

58

C.P. of Dauphin County, no. 872 S 1995.

*Thomas W. Hall* and *Terri L. Ackerman,* for plaintiffs.
*John A. Snyder,* for defendant

Before TURGEON, EVANS & HOOVER, *JJ.*

TURGEON, *J.,* December 29, 1995—Currently, before the court are the defendant's preliminary objections to the plaintiffs' complaint. Oral argument was held before an en banc panel of this court on September 27, 1995.

## FACTS

In January of 1992, Brianne Rideout, at the age of 2, was diagnosed with a brain stem glioblastoma which manifested as a malignant tumor in her brain. She underwent a surgical removal of a portion of the tumor in February of 1992 at Johns Hopkins University Hospital. On April 6, 1992, she was brought to the Hershey Medical Center to undergo an MRI. While there, she began to experience a progressive stupor and difficulty breathing and was transferred to the emergency department. After her admission to the hospital, John E. Neely M.D., informed Brianne's parents, Marlene and

Tyrone Rideout, that Brianne's condition was not curable. The Rideouts, however, were not prepared to give up on their child and favored aggressive chemotherapy treatment to prolong her life.

On April 13, 1992, Brianne suffered an episode of respiratory distress. A tracheostomy was performed and she was placed on a mechanical ventilator. At this time, Brianne was still able to respond to her name and to pain. Her parents continued to advocate aggressive treatment. In fact, they recall a conversation in which Dr. Neely told them that another one of his patients with the same diagnosis had survived the disease and had improved with mechanical ventilation. The Rideouts were aware, however, that the doctors felt Brianne would not survive the tumor and that the ventilator was prolonging her death. Brianne's progress report nevertheless indicated that the hospital was willing "to do whatever [the family] wanted." In late April, the hospital and the Rideouts discussed transferring Brianne to their home and placing her on a mechanical ventilator there; however, the Rideouts were unable to do this because of inadequate electrical wiring in their home.

On May 20, 1992, the Rideouts were informed by the hospital's social services department that Brianne's health insurance coverage might soon be exhausted and that medical assistance would be needed to cover her medical costs. The next day, Dr. Steven Lucking, Brianne's attending physician, convened the hospital's Ethics Committee to discuss Brianne's treatment. During that meeting, it was decided that a "Do Not Resuscitate" ("DNR") order would be instituted. On May 22, 1992, Dr. Lucking informed the Rideouts of the committee's decision to issue a DNR order in the event of a cardiac arrest. The Rideouts verbally expressed their opposition to the decision and the progress report reflects "parents

dissatisfied and want aggressive management of clinical status." With regard to the DNR order, the progress report reflects that it was "explained to the family that *no* support would be withdrawn . . . but that in the event of a cardiac arrest Brianne would not be resuscitated." That same progress report further noted Mrs. Rideout's response: "It's okay for some people who don't regard life and may want their child dead for insurance, but we value Brianne and her life."

Since Brianne's condition was stable and did not require intensive care, the hospital sought to either place her in home care or in a chronic care facility. On May 26, 1992, the hospital's social services department confirmed that Brianne's health coverage would soon be exhausted. In the meantime, the hospital also made efforts to secure alternate housing for the Rideouts. By June 2, 1992, the Rideouts were informed that Brianne had most likely exhausted her current insurance coverage and that they needed to apply for medical assistance as soon as possible. On July 9, 1992, a hospital social worker informed the Rideouts that it would take two to three months before satisfactory arrangements could be made for alternate housing.

On July 12, 1992, Brianne's pupils became fixed and dilated for the first time. On July 13, 1992, Dr. Lucking decided, based upon the discussions and conclusions of the hospital's Ethics Committee, that in light of Brianne's deteriorating condition, the most prudent course of action would be to remove Brianne's ventilator. It was Dr. Lucking's conclusion that continued ventilatory support constituted futile and inappropriate care.

On July 14, 1992, at around 8:30 a.m., Dr. Lucking called the Rideouts and advised them that ventilatory support was futile and that he therefore planned to remove it that day, the result of which was that Brianne

would almost certainly expire. The family was encouraged to be in attendance to say goodbye to Brianne. The Rideouts were vehemently opposed to the plan and threatened legal action. The Rideouts allege in the complaint that it was their religious belief that all human life has value and should be protected. The Rideouts believed that Brianne's recent deterioration was not permanent.

On the same day, Dr. John H. Dossett, Chairman of the hospital's Ethics Committee, met with the Rideouts to confirm with them that it was the hospital's decision to withdraw ventilatory support. The Rideouts immediately spoke with Julia Yost of the hospital's Patient Advocate Office and expressed their anger and concerns. Ms. Yost was able to persuade Drs. Lucking and Dossett to delay discontinuation of the ventilator so that the hospital staff could further consult with its attorneys.

After this consultation and after further discussions with the Ethics Committee and with the hospital administrator, it was decided by the hospital that the ventilator would be discontinued the next morning. The Rideouts then attempted to seek judicial intervention, personally petitioning a judge and obtaining the services of an attorney who agreed to assist them in their efforts to halt disconnection of the ventilator.

The 6 p.m. progress report taken on July 14, 1992 indicates the following: The Rideouts "verbalized intense anger stemming from inconsistent messages, stating that they 'were just told by a social worker that we had time, they weren't going to do anything, now he's telling us they're going to kill her' "; Mrs. Rideout informed hospital staff that "you have no right to do this, you need my consent because she's not brain dead and I haven't signed anything"; Mrs. Rideout referred

to Dr. Lucking as a "murderer." The Rideouts were "reassured that nothing would be done without them present."

The removal of the ventilator was scheduled to be performed at 11 a.m. on July 15, 1992. The hospital had requested Derry Township police officers be present to control any disorderly situation. The Rideouts arrived at the hospital and immediately went to the Patient Advocate Office while the remainder of their family went to Brianne's bedside. Upon learning of the Rideouts' arrival, Dr. Lucking instructed his staff to inform them to come to Brianne's room immediately because they were discontinuing the ventilatory support. Dr. Lucking was informed by Ms. Yost that the Rideouts were on the phone with their lawyer and needed a few more minutes.

At 1:45 p.m., Dr. Lucking removed the ventilatory support without their presence. Simultaneously, the hospital's chaplain, who was located in Brianne's room, announced to the Rideouts over the hospital's intercom system: "they turned her off, they turned her off!" The Rideouts heard the announcement and immediately rushed from the Patient Advocate Office to Brianne's room, hysterically crying and screaming that their child had been murdered. Although Brianne had begun breathing on her own, they begged Dr. Lucking to place her back on the ventilator. Mr. Rideout was so upset that he suffered an acute asthma attack. Because Brianne was breathing on her own, Dr. Neely, her then-attending physician, believed that reconnection would be unnecessary. Two days later, Brianne, unable to get enough oxygen, succumbed to cardiopulmonary failure and died in the presence of her parents.

## DISCUSSION

The Rideouts have filed a complaint in their capacity as administrators of Brianne's estate and individually (collectively "plaintiffs"). The complaint contains 11 counts raising common-law, statutory and constitutional claims. On March 21, 1995, the hospital filed preliminary objections to each of the 11 counts, which are addressed herein.

### *Infliction of Emotional Distress*

In Counts I and II, respectively, the Rideouts allege, individually, that the hospital both negligently and intentionally inflicted emotional distress upon them. The hospital has demurred to both counts. In ruling on a demurrer, we must accept as true all well-pleaded material facts contained in the complaint as well as all inferences reasonably deducible therefrom. *Love v. Cramer,* 414 Pa. Super. 231, 233, 606 A.2d 1175, 1177 (1992). Any doubt as to whether a demurrer should be sustained is to be resolved against the moving party. *Id.* A demurrer is not to be sustained and a complaint dismissed unless the law states with certainty that no recovery is possible. *Hoffman v. Misericordia Hospital of Philadelphia,* 439 Pa. 501, 267 A.2d 867 (1970).

### Negligent Infliction of Emotional Distress

In Count I, the Rideouts allege that as a result of the hospital's negligent act of removing Brianne's ventilator that resulted in her death, Mr. Rideout suffered from an acute asthma attack and they both experienced intense headaches, nausea, depression, nightmares, nervousness, insomnia, stress, anxiety, upset stomach, hysteria. In Pennsylvania, a cause of action for negligent infliction of emotional distress depends upon three factors:

"(1) Whether plaintiff was located near the scene of the accident . . .;

"(2) Whether the shock [or emotional distress] resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident . . . ; and

"(3) Whether plaintiff and the victim were closely related . . . ." *Sinn v. Burd,* 486 Pa. 146, 170-71, 404 A.2d 672, 685 (1979). See also, *Neff v. Lasso,* 382 Pa. Super. 487, 555 A.2d 1304 (1989). In addition, a claim for negligent infliction of emotional distress requires that physical harm be averred. *Fewell v. Besner,* 444 Pa. Super. 559, 568, 664 A.2d 577, 581 (1995).

The hospital asserts that because the Rideouts were not present when Brianne's ventilatory support was discontinued they have failed to sufficiently allege a sensory and contemporaneous observation of the alleged traumatic event(s).

A sensory and contemporaneous observance, however, is not limited to visual observances; aural perception or observance is also permitted. *Krysmalski v. Tarasovich,* 424 Pa. Super. 121, 132, 622 A.2d 298, 303 (1993); *Neff, supra* at 496, 555 A.2d at 1313. The Rideouts argue that the focus of a contemporaneous observation is on the "degree of [their] awareness of the negligent act rather than the source of [their] awareness." *Id.* In *Neff,* the Pennsylvania Superior Court held that a wife, who heard but did not see her husband's fatal automobile accident, could recover for negligent infliction of emotional distress. *Id.* at 489, 555 A.2d at 1305. Although the wife did not see the accident, she viewed her husband coming towards home, followed by the tort-feasor, and heard the crash of the vehicles. *Id.* at 491, 555 A.2d at 1306. The court held that aural perception, when considered with the surrounding cir-

cumstances, may produce a full awareness of the negligent act that could foreseeably result in the emotional injury. *Id.* at 506, 555 A.2d at 1313.

Similarly, in *Krysmalski,* the Superior Court upheld a jury verdict awarding damages for negligent infliction of emotional distress in a case where a mother did not visually witness the tort-feasor recklessly drive into her children but heard the crash. *Id.* at 126, 622 A.2d at 299. The court found that the mother experienced a sensory and contemporaneous perception of the accident because she heard the crash and knew her children were located at the scene. *Id.* at 133, 622 A.2d at 303.

In this case, as in *Neff* and *Krysmalski,* the Rideouts experienced a sensory and contemporaneous observance of the withdrawal of their daughter's ventilatory support because they heard the chaplain exclaim, "they turned her off!" at approximately the same time that their daughter's ventilator was removed. The Rideouts had knowledge of the probable ramifications of the hospital's actions, *i.e.* that Brianne would probably expire upon removal of the ventilator. Based upon the surrounding circumstances, the Rideouts' aural perception of the hospital's act of removing the ventilator compels the conclusion that they have properly alleged a sensory and contemporaneous observance of the hospital's alleged negligent act.

The hospital also asserts that the Rideouts' claim fails to sufficiently aver the existence of a discrete and identifiable traumatic event but instead alleges only a gradual infliction of harm. See *Tackett v. Encke,* 353 Pa. Super. 349, 509 A.2d 1310 (1986); *Berardi v. Johns-Mansville Corp.,* 334 Pa. Super. 36, 482 A.2d 1067 (1984); *Yandrich v. Radic,* 495 Pa. 243, 433 A.2d 459 (1981) (denied recovery to father who arrived at accident scene of child and remained at the hospital until the

child's death a few days later). The Rideouts allege that the discrete and identifiable traumatic events are sufficiently pled under *Love v. Cramer, supra.* In *Love,* a woman witnessed her mother's fatal death from heart failure that resulted from an improper diagnosis by the hospital. The court held "[t]he fact that the negligence of [the doctor] did not take place at the time of the actual injury should not prevent [plaintiff] from attempting to prove her claim. It [was] enough if the negligence constituted the proximate cause of the injury, and the resulting emotional trauma." (footnote omitted) *Id.* at 235, 606 A.2d at 1177. The court further stated that if plaintiff proved her claim, recovery would be based upon the observance of her mother's heart attack, an event caused by the negligence of the doctor that plaintiff also witnessed. *Id.* at 237, 606 A.2d at 1178. In this case, the Rideouts have alleged two discrete and identifiable traumatic events, the hospital's removal of their daughter's ventilatory support and her death.

Finally, the hospital asserts that the Rideouts have failed to allege their requisite close proximity to the traumatic event to establish a claim of negligent emotional distress. *Bloom v. Dubois Regional Medical Center,* 409 Pa. Super. 83, 597 A.2d 671 (1991). The underlying purpose of this requirement is to buffer the emotional impact upon the plaintiff. *Id.* The hospital argues that the Rideouts' prior knowledge of the event was a sufficient buffer to dilute any emotional impact from the actual traumatic event. In *Bloom,* the court held that a husband could not recover negligent infliction of emotional distress damages from witnessing his wife hanging by her shoelaces in her hospital room. The court reasoned that the requisite close proximity or presence requirement was not met because plaintiff had

witnessed no discrete moment in time of the defendant's alleged negligent act.

The Rideouts argue that when they heard the chaplain's exclamation over the intercom they had no time to brace themselves for the emotional shock they experienced. The Rideouts' prior knowledge of the consequences of the hospital's actions could not have buffered the impact of the chaplain's announcement, instead it heightened their emotional distress.

Based on the above reasons, this court concludes that the Rideouts have sufficiently pled a claim for negligent infliction of emotional distress.

Intentional Infliction of Emotional Distress

In Count II, the Rideouts allege that the hospital acted in an extreme and outrageous manner, intentionally inflicting severe emotional distress upon them. Although the viability of this tort is unsettled in our Commonwealth, appellate courts that have recognized this claim have looked to section 46 of the Restatement (Second) of Torts, which provides as follows:

"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm . . . results from it, for such bodily harm.

"(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

"(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm." Restatement (Second) of Torts §46. See also, *Field v. Philadelphia Electric Co.,* 388 Pa. Super. 400, 427, 565 A.2d 1170, 1183 (1989).

To establish a claim of intentional infliction of emotional distress under section 46(1), a plaintiff must demonstrate that the defendant (1) exhibited extreme and outrageous behavior, (2) acted intentionally or recklessly, and (3) caused the plaintiff severe emotional distress. *Williams v. Guzzardi,* 875 F.2d 46 (3d Cir. 1989). Furthermore, a plaintiff must allege some physical manifestation of the emotional distress. *Fewell v. Besner, supra* at 569, 664 A.2d at 582.

The hospital first asserts that the Rideouts cannot maintain this action because they were not present at the time the ventilator was disconnected. This issue was addressed above regarding the Rideouts' claim for negligent infliction of emotional distress and the same analysis and conclusion applies in this case, *i.e.,* the Rideouts' aural and contemporaneous perception of the removal of the ventilator is sufficient to allege presence.

The hospital next asserts that its decision to discontinue Brianne's ventilatory support was a thoroughly reasoned exercise of professional judgment and that accordingly, as a matter of law, it did not act outrageously. *Kelly v. Resource Housing of America Inc.,* 419 Pa. Super. 393, 615 A.2d 423 (1992). Conduct is extreme and outrageous if it "is so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts §46 comment d.

While the hospital's decision to remove the ventilatory support may have been a "reasoned medical decision," the Rideouts have sufficiently alleged that the hospital's implementation of that decision constituted extreme and outrageous conduct; specifically, that the hospital knew that it was discontinuing Brianne's life-sustaining support not only without the Rideouts' consent but also

against their vehement and desperate opposition; that Dr. Lucking knew the Rideouts were in the hospital and were trying to obtain legal assistance to prevent the hospital's action; that the Rideouts had been assured by the hospital that the ventilator would not be removed without their presence and that the hospital, in anticipation of an emotional reaction by the Rideouts, had secured the presence of Derry Township police officers.

Accordingly, this court concludes that the Rideouts have sufficiently alleged a claim for intentional infliction of emotional distress.

### Lack of Consent

In Counts III through VIII, the plaintiffs have made numerous allegations that their common-law and constitutional rights were violated, all stemming from the hospital's unilateral decision to remove life-sustaining treatment from Brianne. Their allegations can be summarized as follows: Count III—disconnection of the ventilator was done without their informed consent and violated their common-law right of self-determination as well as their privacy right under Article 1, Section 1 of the Pennsylvania Constitution; Count IV—disconnection of the ventilator without consent violated the plaintiffs' liberty interest as protected by the due process clause of the Fourteenth Amendment to the federal Constitution; Counts V and VI—the hospital's unilateral decision violated the Rideouts' parental rights under Article 1, Sections 1, 9 and 26 of the Pennsylvania Constitution as well as the due process clause to the Fourteenth Amendment; and Counts VII and VIII—the hospital's unilateral decision deprived the plaintiffs of free exercise of religion as protected by Article 1, Section 3 of the Pennsylvania Constitution as well as their federal constitutional rights under the First and Fourteenth

Amendments. The hospital has demurred to all of these allegations.

## Lack of Consent—Common-Law Theory

As noted above, the plaintiffs' allegation that disconnection of the ventilator was done without their informed consent is based upon two theories; one a common-law right of self-determination and the other a privacy right under Article 1, Section 1 of the Pennsylvania Constitution. The hospital's demurrer to this count will be overruled as set forth under a common-law theory and sustained as set forth under a state constitutional theory.

Pennsylvania's common-law lack of informed consent doctrine is grounded in a tort theory of battery. *Gray v. Grunnagle,* 423 Pa. 144, 223 A.2d 663 (1966). The principles of law applicable to an action under this tort are that where a patient is mentally and physically able to consult about his or her condition, the informed consent of the patient is a prerequisite to a surgical operation by his or her physician and an operation without the patient's consent is a technical assault. *Moure v. Raeuchle,* 529 Pa. 394, 404, 604 A.2d 1003, 1008 (1992). The doctrine of informed consent has also been interpreted as encompassing the right to informed refusal. See *In re A.C.,* 573 A.2d 1235, 1243 (D.C. App. 1990) (citing *In re Conroy,* 486 A.2d 1209, 1222 (N.J. 1985)). This doctrine is rooted in the concept of bodily integrity and is deeply ingrained in common law. *In re A.C.* at 1243.

"No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law

. . ., 'The right to one's person may be said to be a right of complete immunity: to be let alone.' [quoting *In re Conroy* at 1221-1222]

"In [Pennsylvania], because a physician/patient relation is a consensual one, where a physician renders services in the absence of informed consent, there is an actionable tort under the theory of battery. [citations and footnote omitted]

"As noted by one commentator with regard to the 'right of self-determination':

"Since the right of self-determination can only be exercised by a person competent to evaluate her condition, *a patient lacking this capacity forfeits her right of self-determination unless the surrogate decision-maker, standing in the place of the incompetent, asserts the patient's preference.* . . . [citation omitted]" *In re Fiori,* 438 Pa. Super. 610, 651, 652 A.2d 1350, 1370-71 (1995) (en banc) (Popovich, J., concurring and dissenting) (emphasis added), *alloc. granted,* 540 Pa. 600, 655 A.2d 989 (1989).

Accordingly, where a surgical procedure is performed upon an incompetent, the physician must obtain consent by way of the patient's surrogate. *Id.* Under the facts as alleged, the patient's surrogate, the Rideouts, did not consent to the procedure.[1]

---

1. It is further unclear that even if the Rideouts had consented to the removal of the ventilator, whether that decision would have comported with current Pennsylvania law. In *Fiori,* Judge Beck, writing for the majority of the Superior Court, addressed the situation where the family of an *incompetent adult,* who was in a long-term persistent vegetative state, wished to terminate his life-sustaining treatment. The patient had not previously expressed a view as to whether life-sustaining treatment should be terminated. The court held that such treatment could be terminated without leave of court where a closely-related family member consented to the termination

The hospital's main argument, however, is that the removal of the ventilator was not a surgical procedure, which is a required element under Pennsylvania's common-law doctrine of informed consent. See *Sinclair by Sinclair v. Block,* 534 Pa. 563, 571, 633 A.2d 1137, 1140 (1993) and *Wu v. Spence,* 413 Pa. Super. 352, 354, 605 A.2d 395, 396-97 (1992), *alloc. granted,* 534 Pa. 309, 632 A.2d 1294 (1993).

While the hospital may be proven correct on this point, it is too early for this court to dismiss Count III. It appears from the complaint that Brianne's mechanical ventilation was achieved via a tracheostomy tube. The performance of the tracheostomy was obviously a surgical procedure. See Attorneys' Textbook of Medicine (3d ed.) paragraph 207.11(2b) ("a tracheostomy is the creation of an airway by inserting a tube through an incision made into the trachea from the neck"). It is unclear from the complaint how ventilatory support was terminated. The complaint alleges that the hospital "disconnected Brianne's ventilatory support." (Complaint, paragraph 109.) Since this disconnection may have involved a surgical procedure, the hospital's demurrer must be overruled.

The hospital further argues, and we agree, that the Rideouts clearly cannot individually maintain an action for lack of informed consent since they were not the recipients of the unconsented touching. Accordingly, the hospital's demurrer will be sustained to the Rideouts' individual actions.

---

and where at least two qualified physicians approved. *Id.* at 613, 652 A.2d at 1351. Judge Beck limited the holding to the facts, noting that the development of the law as to other cases should wait for another day, specifically mentioning cases involving "never competent children . . . severely impaired since birth." *Id.* at 616, 652 A.2d at 1353.

We now turn to the plaintiffs' allegation in Count III that the failure of the hospital to obtain their consent was in contravention of Brianne's privacy rights under Article 1, Section 1 of our state constitution, which provides that "[a]ll men . . . have certain inherent and indefeasible rights, among which are those enjoying and defending life and liberty. . . ." Indeed, the right of self-determination as to decisions concerning medical treatment emanates from a state privacy right as grounded in Article 1, Sections 1 and 8 of the state constitution. *Fiori, supra* at 618 n.3, 652 A.2d at 1354 n.3. Since we believe this allegation is subject to a similar analysis set forth in discussing Count IV (violation liberty interest), we turn to that allegation.

Lack of Consent—Constitutional-Based Theory

In Count IV the plaintiffs allege that the hospital violated their due process rights as set forth in the Fourteenth Amendment to the United States Constitution which provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

Specifically, it is alleged that Brianne retained her right to give or withhold consent to life-sustaining treatment, through her surrogate, her parents, or through a court-appointed guardian ad litem, and that this right to make such a decision was among the liberty interests protected by the due process clause of the Fourteenth Amendment. Those liberty interests include the right to privacy, autonomy and personal dignity. The Rideouts bring this civil rights action pursuant to 42 U.S.C. §1983, arguing that the hospital's decision to terminate her support constituted "state action" made "under the color of law."

The hospital's main argument in support of its demurrer is that the Rideouts have failed to assert the

violation of a constitutionally-protected right. In order to maintain an action under section 1983, a plaintiff is required to establish that (1) a person or persons have deprived him or her of some cognizable federal right, and (2) the person or persons deprived the plaintiff while acting under the color of state law. *Heinly v. Commonwealth,* 153 Pa. Commw. 599, 621 A.2d 1212 (1993). The hospital has not challenged the allegation that it was acting under the color of state law.

The hospital notes that in analyzing substantive due process claims, the United States Supreme Court has emphasized the importance of judicial restraint and has cautioned that such an analysis must begin with a careful description of the asserted right. *Collins v. City of Hacker Heights,* 503 U.S. 115, 112 S.Ct. 1061 (1992) and *Reno v. Flores,* 507 U.S. 292, 113 S.Ct. 1439 (1993).

Accordingly, the hospital maintains that the Rideouts are, in reality, not asserting a right to privacy, autonomy and/or personal dignity, but are instead asserting a con-stitutionally-protected unilateral right to insist upon or demand continuation of mechanical ventilatory support on behalf of Brianne. The hospital maintains that no such constitutional right to medical care or treatment exists citing, *Johnson v. Thompson,* 971 F.2d 1487 (10th Cir. 1992), *cert. denied,* 113 S.Ct. 155.

The Rideouts do not dispute that a constitutional right to receive medical treatment does not exist; however, they argue that the hospital has mischaracterized their allegation as such. Instead, they argue they have alleged that the hospital violated both Brianne's and their own right to consent to removal of the life-sustaining support, or, in lieu of obtaining their consent, requiring that the hospital obtain court approval.

Analysis of this case under relevant case law is made difficult by its unique facts. Most cases dealing with

life-sustaining medical treatment issues are raised in the context of an assertion by an individual's guardian of the individual's "right to die" by way of rejection or withdrawal of life-sustaining medical support. It is therefore instructive to review some of those cases.

The issue was addressed for the first time by the courts of this country in 1976, in the highly publicized and seminal case involving Karen Ann Quinlan. *In re Quinlan,* 355 A.2d 647 (N.J. 1976), *cert. denied,* 429 U.S. 922. The United States Supreme Court did not address the issue until 1990 in *Cruzan v. Director, Missouri Department of Health,* 497 U.S. 261, 110 S.Ct. 2841 (1990). Amazingly, no Pennsylvania appellate court addressed the issue until our Superior Court issued an opinion earlier this year in *In re Fiori, supra,* currently before the Pennsylvania Supreme Court on appeal.

These cases, and without exception all of the cases involving the "right to die," recognize that every individual has the right to refuse life-sustaining medical treatment. Most courts have based this right on a common-law right to informed consent, a state constitutional provision or statutory enactment and/or a federal constitutional privacy right. *Cruzan, supra,* 110 S.Ct at 2847; *Fiori, supra* at 633, 652 A.2d at 1361-62 (cases cited therein) (Wieand, J., concurring). As noted above, the majority in *Fiori,* determined that the right in this Commonwealth to refuse medical treatment emanates from a privacy right grounded in the state's constitution. In addition, the United States Supreme Court in *Cruzan* held that this right derives from the liberty interest located in the due process clause of the Fourteenth Amendment. *Id.* 110 S.Ct. at 2851. See *Fiori, supra* at 617, 652 A.2d at 1353 ("eight of the nine justices [in *Cruzan*] found a federal due process liberty interest in refusing unwanted medical treatment").

Whatever the source of the right to refuse life-sustaining medical treatment, the majority of courts hold that it survives incompetency. *Fiori, supra* at 621, 652 A.2d at 1355. See also, *Id.* at 635, 652 A.2d at 1362 (Wieand, J., concurring). As to whether a minor maintains the same right, our research has revealed three cases, all of which held that the right to refuse medical treatment is not lost because of minority. *In re L.H.R.,* 321 S.E.2d 716, 722 (Ga. 1984); *In re Rosebush,* 491 N.W.2d 633, 636 (Mich. App. 1992) and *In re Barry,* 445 So.2d 365, 371 (Fla. Dist. Ct. App. 1984).

However, as recognized by the learned Judge Beck in *Fiori,* whether asserted by a competent or incompetent individual:

"[T]he right to self-determination as to one's own medical treatment is not absolute. The state has interests that are implicated in cases involving the termination of life sustaining treatment. These interests have classically been identified as consisting of the state's interests in the preservation of life, the prevention of suicide, the protection of third parties and the integrity of the medical profession." *Id.* at 619, 652 A.2d at 1354. See also, *Cruzan, supra,* 110 S.Ct. at 2847-8. Normally, in "right to die" cases, only the state's interest in the preservation of life has been implicated, although, the facts of the case before us raise the specter that the state's interest in the integrity of the medical profession is also implicated.

The state's interest in the preservation of life encompasses not only the state's institutional interest in preserving the sanctity of all human life but also a particular individual's right to life as protected by the due process clause of the Fourteenth Amendment and equivalent state constitutional provisions. *Cruzan, 110 S.Ct. at 2853-54 n.10; In re Farrell,* 529 A.2d 404,

411 (N.J. 1987). See also, *Cruzan, supra* at 2889 (Stevens, J., dissenting). In fact, as was recognized by Justice Stevens in his dissent in *Cruzan,* right to die decisions "put into disquieting conflict" the individual's right to life and the right of liberty. *Id.*

Typically, in these "right to die" cases, it is the state, asserting its well-established interest in the preservation of life, which challenges an incompetent individual's right to refuse such treatment and seeks court intervention to halt the removal of life-sustaining support. See *e.g., Cruzan* and *Fiori.* Oftentimes, however, where the state is not directly involved, the hospital acts in the state's role, seeking clarification from the courts that the state's interest in life is given due consideration or more typically seeking to limit its potential liability, even though the hospital agrees with the surrogate's decision to refuse life-sustaining medical treatment on behalf of the incompetent individual. See *e.g., L.H.R, supra* at 716.

This case is truly exceptional in that the hospital here unilaterally asserted, and in fact usurped, the minor incompetent's state privacy and/or federal liberty-based right to *refuse* life-sustaining medical treatment. In contrast, the Rideouts attempted to act, albeit too late, in the role traditionally asserted by the state, which is to act to *preserve* human life.

Accordingly, under both federal and state constitutional law, it appears, based upon the facts alleged, that Brianne's particularized interest in her own life was infringed upon when the hospital decided, unilaterally, without resort to the courts, to discontinue her life-support.[2] However, the Rideouts have not al-

---

2. It is abundantly clear that under the current state of the law in Pennsylvania, as set forth in *Fiori,* the hospital would have been required to seek judicial intervention in order to withdraw life support

leged, under either the state or federal constitutions, that Brianne's *life* interest was deprived in this case. Instead they assert a deprivation of a *liberty/privacy* interest; specifically, that they had the right to make the decision whether to give or withhold consent to life-sustaining treatment.

since there was a dispute among the parties as to this course of action and also because Brianne was a "never-competent minor." See footnote 1.

Unfortunately, *Fiori* was decided a few years after the hospital made its decision in this case. Nevertheless, the overwhelming majority of law from other jurisdictions at the time indicates that, even in jurisdictions which disfavor judicial intervention in "right to die" cases on general principle, court intervention is required in the event of disagreement between the parties. See *e.g., Farrell, supra* at 415 (court intervention not appropriate except in unusual circumstances where there is conflict among physicians or family members, or between both); *Rosebush, supra* at 639 (judicial involvement on behalf of minor need only occur when the parties directly concerned with the decision disagree about treatment); and *Barry, supra* at 372 (where minor involved, intervention required "where doubt exists, or there is a lack of concurrence among the family, physicians, and the hospital, or if an affected party simply desires a judicial order"). See also, President's Commission for the Study of Ethical Problems in Medical and Biomedical Research (1983), "Deciding to Forego Life-Sustaining Treatment" at 154 ("The commission concludes that ordinarily a patient's surrogate—whether designated through judicial proceedings or informally—should have the legal authority to make decisions on behalf of an incapacitated patient.").

Thus, while the hospital was without Pennsylvania appellate guidance on how to proceed with what it believed was in the best interests of Brianne, its decision to unilaterally withdraw life support without the benefit of court intervention was made in clear contravention to the overwhelming majority of case law at that time which stressed the need for judicial intervention in cases where there was disagreement between the parties.

There are two aspects of this issue in the context of life-sustaining medical treatment cases—the decision to reject or withdraw treatment on the one hand and the decision to continue or request treatment on the other. However, only the former implicates a liberty/privacy interest. As illustrated in *Cruzan* with regard to the liberty interest and in *Fiori* with regard to the privacy interest, these interests are always defined in terms of a right to refuse medical treatment—not the right to demand or seek continuance of such treatment.

Fundamentally, this liberty/privacy interest in refusing medical care is based upon the concept of bodily integrity; that right of every individual to be let alone, free from unwanted restraint, interference or touching. *Cruzan, supra* at 2846-47; *Fiori, supra* at 618, 652 A.2d at 1354 (quoting *Stenger v. Lehigh Valley Hospital Center,* 530 Pa. 426, 609 A.2d 796 (1992)). See also, *Cruzan* at 2856 (O'Connor, J., concurring) ("the liberty interest in refusing medical treatment flows from decisions involving the state's invasions into our body"). However, a requirement that consent must be given to refrain from touching would not invoke a liberty/privacy interest. We therefore agree with the hospital that the Rideouts' claim necessarily rests upon an assertion that they had the right to demand medical care or treatment. As set forth in *Johnson v. Thompson,* the Tenth Circuit reasoned as follows:

"The Due Process Clause does protect an interest in life. [citing *Cruzan*] It does not follow, however, that the state necessarily has a constitutional duty to take affirmative steps to preserve life. In *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct 998 (1989) the Supreme Court explained:

"The [Due Process] Clause is phrased as a limitation on the state's power to act, not as a guarantee of certain minimal levels of safety or security. It forbids the state itself to deprive individuals of life, liberty or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the state to ensure that those interests do not come to harm through other means. *Id.* at 193, 109 S.Ct at 1007.

"In effect, the appellants argue that substantive due process implies a right to treatment. Such a right exists only in narrow circumstances, however. Specifically, "when the state takes a person into custody and holds him there against his will, the constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." [citations omitted]

"Infants born with spina bifida do not fall into the above category; accordingly such infants cannot claim a constitutional right to treatment. Without such a right, the appellants cannot claim a deprivation of their liberty interest if the state failed to treat them. [citation omitted]

"The fact that the state did provide some medical services does not alter this analysis. The First Circuit recently stated in an analogous situation involving a §1983 claim:

"Although the [state] may have played some causal role in the harm, it did so only because [the plaintiff] voluntarily availed himself of a [state] service. The [state] did not force [the plaintiff], against his will, to become dependent upon it. Thus, the [state's] actions, while possibly negligent or even willfully indifferent or reckless, did not take on the added character of violations of the federal Constitution.

*"Monahan v. Dorchester Counseling Center Inc.,* 961 F.2d 987, 993 (1st Cir. 1992). Similarly, the fact that appellants received some medical benefits at OCMH did not entitle them to further treatment based on substantive due process." *Johnson v. Thompson, supra* at 1495-96.

We find this reasoning equally applicable to the assertion of a state privacy right in Count III. Therefore, based upon all of the above, we conclude that the plaintiffs have failed to allege a deprivation of a privacy interest under the state constitution as alleged in Count III as well as a deprivation of a cognizable liberty interest under the Fourteenth Amendment to the federal constitution in Count IV.

### Deprivation of Parental Rights

The Rideouts argue in Counts V through VIII that the hospital violated their hybrid right to free exercise of religion and parental autonomy. They claim that they retained the right, under state and federal constitutional provisions, to make medical decisions on Brianne's behalf including the right to decide if and when Brianne's life-sustaining ventilation should be disconnected.

Initially we note that the allegations in Counts V through VIII are raised by the Rideouts both individually and on behalf of Brianne's estate. However, it is clear that these allegations relate only to the Rideouts' rights as parents and cannot be asserted on behalf of the estate.

In Counts V and VI, the Rideouts allege that the hospital violated their parental rights as protected by Article 1, Sections 1, 9 and 26 of the Pennsylvania Constitution[3] as well as the due process clause of the

---

3. It is unclear why plaintiffs have cited to Sections 9 and 26 of Article 1 of the state constitution. Section 9 deals with the rights

Fourteenth Amendment to the United States Constitution.[4]

It is beyond question that both the state and federal constitutions protect a parent's right to make important decisions for and on behalf of their minor children. See *e.g., Green Appeal,* 448 Pa. 338, 292 A.2d 387 (1972); *Parham v. J.R.,* 442 U.S. 584, 602-604, 99 S.Ct. 2493, 2504-2505 (1979). The right to make important decisions is based upon the constitutional right of privacy. As stated by the Pennsylvania Supreme Court:

"There is no longer any question that the United States Constitution provides protection for an individual's right of privacy. . . . At least two distinct types of privacy interests have been recognized. 'One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.'. . . This court has recognized these same interests under the Pennsylvania Constitution." *Stenger v. Lehigh Valley Hospital Center, supra* at 434, 609 A.2d at 800 (citations omitted); See also, *Fischer v. Department of Public Welfare,* 116 Pa. Commw. 437, 543 A.2d 177 (1988).

While the hospital concedes that the constitution protects the presumptive parental right to make medical decisions on behalf of their children, it nevertheless

---

of the accused in criminal prosecutions and is clearly inapplicable. Section 26, a state equal protection provision, prohibits the state and its political subdivisions from discriminating against any person. Plaintiffs have not alleged in Count V either discrimination or that the hospital is a political subdivision and is therefore inapplicable as well.

4. As with Count IV, the plaintiffs' allegations for violations of the United States Constitution in Count VI is brought as a civil rights action pursuant to 42 U.S.C. §1983.

argues that this parental right has not been so expansively interpreted as to give parents a right to insist upon medical treatment which the hospital is unwilling to provide.

We are inclined to agree that generally, a hospital and/or physician is not compelled to obtain parental approval in every aspect of treating a child as this would divest them of their professional discretion and judgment in determining the best interests of the patient. However, the situation before us does not involve just any medical treatment. This case involves removal of *life-sustaining* medical treatment; as such, Brianne's constitutionally-based right to life was implicated. We believe that a parent's constitutionally-protected privacy interest in making important decisions on behalf of their children must include among them the right to assert their child's right to life. Accordingly, we agree that the Rideouts have sufficiently alleged that their privacy-based parental rights were violated under both state and federal constitutions.

## Free Exercise of Religion

In Counts VII and VIII, the Rideouts allege a similar deprivation of parental rights as discussed above. Specifically, it is alleged that the hospital's unilateral actions deprived them of free exercise of religion as protected by Article 1, Section 3 of the Pennsylvania Constitution as well as their federal constitutional rights under the First and Fourteenth Amendments.[5] Article 1, Section 3 provides that "no human authority can, in any case whatever, control or interfere with the rights of conscience. . . ." The First Amendment, applicable to the

---

5. Count VIII is also brought as a civil rights action pursuant to 42 U.S.C. §1983.

states through the Fourteenth Amendment, protects an individual's free exercise of religion. Where provisions of the state constitution are at issue, state courts are not absolutely bound by, but should be guided by the decisions of the United States Supreme Court. *Fischer v. Department of Public Welfare,* 85 Pa. Commw. 215, 482 A.2d 1137 (1984).

Initially, we note that the United States Supreme Court has recognized a parental right to the free exercise of religion on behalf of their children. *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 881-82, 110 S.Ct. 1595, 1601 (1990); *Wisconsin v. Yoder,* 404 U.S. 205, 223, 92 S.Ct. 1526, 1542 (1972). Pennsylvania has also recognized that parents have a right to raise their children by their religious beliefs. This right derives from the First Amendment and Article 1, Section 3 of the state constitution as well as from the state's traditional deference to parental authority over their child. *Commonwealth v. Barnhart,* 345 Pa. Super. 10, 21, 497 A.2d 616, 622 (1985), *alloc. denied,* 517 Pa. 620, 538 A.2d 874, *cert. denied,* 488 U.S. 817 (1988).

The hospital maintains that the Rideouts' free exercise claim is based upon the following naked allegation:

"Brianne's parents were vehemently opposed to the discontinuation of Brianne's life-sustaining ventilator treatment, because of their religious belief that all human life, including their daughter's life, has value and should be protected." (Complaint, paragraph 75.)

The hospital asserts that there are no allegations in the complaint that this religious conviction was communicated to any of the hospital staff. Rather, the Rideouts merely allege that they held such a conviction. The hospital also argues that the Rideouts' belief that life is sacred is not sufficiently religious in nature.

First, we disagree, at this stage of the pleadings, that it cannot be inferred from the facts alleged in the complaint that the Rideouts' opposition to termination of life support was rooted in a particular religious belief. Specifically, in her dissatisfaction to the DNR order, Mrs. Rideout, as recorded in hospital records, indicated that she and her husband had a high regard for life. Furthermore, the Rideouts consistently opposed any action by the hospital which would not prolong Brianne's life which reflects that, whatever its ultimate source, the Rideouts' opposition was based on a sincerely-held belief that it was not for the hospital to decide when Brianne's life should end.

Second, we disagree that the allegations are insufficient to be considered religious in nature, at this stage in the pleadings. The United States Supreme Court has defined religion broadly. See Laurence Tribe, *American Constitutional Law,* §14-6 "Defining 'Religion' in the First Amendment" (1988). Religious beliefs "need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection" nor do they need to be fully developed. *Thomas v. Review Board of Indiana Employment Security Division,* 450 U.S. 707, 714, 101 S.Ct. 1425, 1430 (1981). See also, *United States v. Kauten,* 133 F.2d 703, 708 (2d Cir. 1943) ("Religious belief arises from a sense of the inadequacy of reason as a means of relating the individual to his fellow-men and to his universe. . . ."). Furthermore, a plaintiff's inability to articulate beliefs with clarity does not preclude constitutional protection. *Thomas v. Review Board, supra,* 101 S.Ct. at 1430. The test is "whether a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God." *United States v. Seeger,* 380 U.S. 163, 165-66,

85 S.Ct. 850, 854 (1965). We agree with the Rideouts that they have sufficiently alleged that their expression that all life is sacred and their objection to removal of the ventilator, under the circumstances, reveals that their belief occupies a place parallel to convictions rooted in an orthodox belief in God.

## Federal Statutory Remedies

In Counts IX and X respectively, the plaintiffs allege that the hospital violated two federal statutes, respectively; the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. §1395dd and the Rehabilitation Act of 1973, as amended, 29 U.S.C. §794.

Emergency Medical Treatment and Active Labor Act

The hospital demurs to Count IX in which the Rideouts allege, both individually and on behalf of Brianne's estate, that the hospital's removal of Brianne's mechanical ventilator was within the category of treatment implicated by section 1395dd of the EMTALA.

This statute was enacted to address "patient dumping" of indigent or uninsured patients. *Brooks v. Maryland General Hospital,* 996 F.2d 708, 710 (4th Cir. 1993). EMTALA imposes two duties upon hospitals. The initial duty is triggered when "any individual comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition." 42 U.S.C. §1395dd(a). Once this occurs, the hospital must provide an appropriate medical screening examination to determine whether or not an emergency medical condition exists. *Id.* An "emergency medical condition" is defined as:

"A medical condition manifesting itself by acute symptom of sufficient severity (including severe pain)

such that absence of immediate medical attention could reasonably be expected to result in—

"(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

"(ii) serious impairment to bodily functions, or

"(iii) serious dysfunction of any bodily organ or part." 42 U.S.C. §1395dd(e)(1)(A).

If the hospital determines that an emergency medical condition exists, a second emergency medical condition exists, a second duty arises. The hospital must provide stabilizing treatment as follows:

"(A) Within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

"(B) For transfer of the individual to another medical facility in accordance with subsection (c) of this section." 42 U.S.C. §1395dd(b)(1).

The issue presented in this case is whether or not discontinuation of Brianne's mechanical ventilator after approximately three months of medical treatment and after Brianne's pupils had become fixed and dilated was in violation of the prohibition of "patient dumping" intended by the act. *Collins v. DePaul Hospital,* 963 F.2d 303 (10th Cir. 1992).

The hospital claims it properly recognized Brianne's emergency medical condition, treated it by attaching her to a mechanical ventilator, and stabilized her until such time as discharge or transfer was determined to be impossible. The hospital cites the Tenth Circuit case of *Collins*. There, the plaintiff was taken to the hospital emergency room and treated for numerous injuries he suffered in an accident. His condition was stabilized

and he remained in the hospital for 26 days. However, the hospital released him without detecting that he had a fractured hip. Plaintiff alleged that the hospital violated EMTALA because it failed to detect his hip fracture and, thus, discharged him in an unstable condition. The court granted summary judgment for the hospital, finding that:

"After the hospital made its screening examination of Collins, it is quite obvious that it determined that an 'emergency medical condition' did exist. After its examination, the hospital did not send him home, rather it placed him in ICU, and treated him for the next 26 days. Such is not in dispute, and, in our view, in and of itself defeats any claim of Collins based on 42 U.S.C. §1395dd(a)." *Collins, supra* at 307. (footnote omitted)

The Fourth Circuit addressed a similar issue in *Matter of Baby K,* 16 F.3d 590 (4th Cir. 1994). The court held that the hospital was required by EMTALA to provide mechanical respiratory treatment to the infant when brought to the hospital's emergency room despite the hospital's assertion that such treatment was unethical and inappropriate. Baby K had been born with anencephaly, a condition where partial parts of the brain, skull, and scalp are missing. The infant was placed on a mechanical ventilator to assist with her breathing. The physicians explained to the infant's parents that anencephalic infants die within a few days and the hospital recommended providing only supportive care. Baby K's parents refused and insisted that Baby K be provided with mechanical support whenever Baby K developed breathing difficulty. Eventually, Baby K was transferred to a nursing home when the services of the acute-care hospital were no longer required. Each time Baby K's breathing became difficult she was read-

mitted to the hospital and the hospital provided mechanical ventilatory support, even though it believed such treatment was inappropriate.

On a declaratory judgment, the court held that because Baby K's breathing difficulties constituted an emergency medical condition, the hospital, pursuant to the EMTALA, had a duty to provide Baby K with stabilizing treatment through the use of a mechanical respirator on each occasion she was presented to the hospital.

However, this case is more analogous to *Collins* wherein at the time Brianne suffered from respiratory distress, the hospital provided emergency medical treatment by transferring her to the Pediatric Intensive Care Unit ("PICU"), performing a tracheostomy and placing her on a mechanical ventilator, which stabilized her condition. The hospital maintained her stabilization for approximately three months. There is no allegation in this case of a failure on the part of the hospital to provide appropriate stabilization of Brianne's emergency medical condition, which "in and of itself defeats any claim of 42 U.S.C. §1395dd(a)." *Collins, supra* at 307.

Moreover, there is no sufficiently alleged claim of "patient dumping." One district court noted that Congress had not designed the act to provide a federal remedy for medical malpractice or misdiagnosis. *Griffith v. Mt. Carmel Medical Center,* 831 F. Supp. 1532 (D. Kan. 1993); accord, *Barber v. Hospital Corp. of America,* 977 F.2d 872 (4th Cir. 1992); *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037 (D.C. Cir. 1991). Congress limited recovery under EMTALA to situations where a plaintiff did not receive appropriate medical screening or was not stabilized before being transferred or discharged. *Id.* In this case, Brianne received appropriate medical screening and her emergency

medical condition was properly stabilized for approximately three months. In addition, discharge or transfer from the hospital was unlikely because on July 13, 1992, Brianne's condition had worsened. Furthermore, on July 9, 1992, the Rideouts were informed that no appropriate arrangements to transfer Brianne home were available for another one to two months.

For these reasons this court concludes that the plaintiffs, individually, and on behalf of Brianne, have failed to sufficiently allege a claim for violation of the EMTALA and the hospital's demurrer is therefore sustained.

## Rehabilitation Act of 1973

The hospital demurs to Count X in which the Rideouts allege, both individually and on behalf of Brianne's estate, that the hospital discriminated against Brianne solely based upon her handicapped condition in violation of section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §794. The Rehabilitation Act provides:

"No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. . . ." 29 U.S.C. §794.

In order to properly plead a violation of the Rehabilitation Act, a plaintiff must plead: (1) that he or she is an individual with a disability under the act, (2) that he or she is otherwise qualified for the benefit sought, (3) that he or she was discriminated against solely by reason of her disability; and (4) that the program or activity receives federal financial assistance.

*Wagner by Wagner v. Fair Acres Geriatric Center,* 49 F.3d 1002, 1009 (3d Cir. 1995); *Johnson v. Thompson,* 971 F.2d 1487 (10th Cir. 1992), *cert. denied,* 113 S.Ct. 155. Specifically, the Rideouts allege that the hospital removed and withheld ventilatory support from Brianne because of her handicap and that she was "otherwise qualified" to receive such support. The hospital, assuming the existence of a disability, challenges the existence of the second element, that Brianne was "otherwise qualified" for the benefit sought. An "otherwise qualified" handicapped individual is "one who can meet all of the program's requirements in spite of his handicap." *Wagner, supra* at 1009 (citing *Southeastern Community College v. Davis,* 442 U.S. 397 (1979)).

The hospital claims that the facts of the present case do not support a violation of the Rehabilitation Act because medical treatment cases do not fall under section 504 when the disputed treatment was directly related to the alleged disability. Here, the hospital maintains that the Rideouts cannot logically argue that Brianne would have been otherwise qualified to receive ventilatory support absent her disabling brain stem cancer since it was the existence of her cancer which necessitated the use of a ventilator. Decisions rendered by the Second and Tenth Circuit Courts support the hospital's argument. *United States v. University Hospital, State University of New York,* 729 F.2d 144 (2d Cir. 1984) and *Johnson v. Thompson, supra.*

In *University Hospital,* the United States Department of Health and Human Services, under its authority to conduct investigations into possible violations of section 504, sought hospital medical records of an infant who suffered severe birth defects. HHS believed that aggressive medical treatment had not been provided to the infant. The Second Circuit upheld the district court's ruling denying HHS's request, concluding that where

the disputed treatment (lack of aggressive treatment) was directly related to the alleged disabling condition (birth defects), the Rehabilitation Act could not apply. The court recognized that the "otherwise qualified" criterion could not be applied to medical treatment decisions because it typically is the handicap itself that gives rise to the treatment at issue. *Id.* at 156. As stated by the court: "where the handicapping condition is related to the condition(s) to be treated, it will rarely, if ever, be possible to say with certainty that a particular decision was 'discriminatory' [based on the disability]." *Id.* at 157.

In *Johnson v. Thompson,* the Tenth Circuit Court adopted the Second Circuit's reasoning. The court held that health care providers who chose to provide conservative treatment to children with more serious cases of spina bifida while treating less serious cases more aggressively, did not violate the Rehabilitation Act. The court noted:

"The 'otherwise qualified' language when considered with the 'solely' language of the third condition, poses a formidable obstacle for anyone alleging discrimination in violation of section 504 based upon the failure to receive medical treatment for a birth defect. . . . Ordinarily, however, if such a person were not so handicapped, he or she would not need the medical treatment and thus would not 'otherwise qualify' for the treatment." *Id.* at 1493.

We agree with the hospital's argument that under these cases, Brianne was not "otherwise qualified" to receive mechanical ventilatory support absent her disabling condition since that condition (brain stem cancer) was related to the condition to be treated (lack of oxygen).[6] As such, we conclude that the Rideouts have

_____

6. Indeed, if the facts in this case would be deemed sufficient to give rise to a cause of action under section 504, it is hard to

failed to set forth a cause of action under the Rehabilitation Act.

The Rideouts warn that the interpretation of "otherwise qualified" as set forth in *University Hospital* and in *Johnson* is an advocation of blanket immunity from the Rehabilitation Act for cases involving medical treatment. Such a result, they contend, will act to preclude any handicapped infant seeking treatment from ever coming within the scope of section 504. In support, the Rideouts cite *Wagner by Wagner v. Fair Acres Geriatric Center* where the court stated as follows:

"It is irrelevant why a plaintiff sought access to a program, service or institution; our concern, for purposes of section 504, is why a plaintiff is *denied* access to a program, service or institution. . . . Further if the district court's analysis is taken to its logical extreme, no program, service or institution designed specifically to meet the needs of the handicapped would ever have to comply with section 504 because every applicant would seek access to the program or facility *because* of a handicap, not in spite of it." *Id.* at 1010. (emphasis in original)

While we do not dispute this statement, we note that the court in *Wagner* specifically recognized that the case before it, involving refusal by an intermediate care nursing facility to admit an Alzheimer's patient, did not involve a medical treatment decision and distinguished *University Hospital* on that basis. *Id.* at 1011. Accordingly, we do not interpret the *University Hospital* and *Johnson* cases as standing for the proposition that *no* medical treatment case will ever involve an "otherwise qualified" individual under section 504. For in-

---

fathom any situation involving a medical decision to withhold treatment for medical reasons ever failing to give rise to such an action. This clearly could not have been the intent of the Rehabilitation Act. See *University Hospital, supra* at 157.

stance, the *Johnson* court specifically recognized situations in which a section 504 action might be appropriate in cases involving medical treatment. *Id.* at 1494 n.3 (for example, a Down's syndrome child refused care for an esophageal obstruction unrelated to the handicap would be otherwise qualified to have that obstruction removed where an otherwise normal child would be given identical treatment). See also, *Glanz v. Vernick,* 750 F. Supp. 39, 45-46 (D. Mass. 1990) (refusing to dismiss a section 504 action where a physician denied treatment to an HIV-positive patient for an ear condition).

As noted by the Seventh Circuit, "the Rehabilitation Act forbids discrimination based upon stereotypes about a handicap but it does not forbid decisions based on the actual attributes of the handicap." *Anderson v. University of Wisconsin,* 841 F.2d 737, 740 (7th Cir. 1988). Accordingly, since Brianne's medical disability was the same condition for which she sought treatment by way of connection to a mechanical ventilator, the Rideouts have failed to set forth a cause of action under the Rehabilitation Act.

### Punitive Damages

Finally, the hospital demurs to Count XI in which the Rideouts seek, both individually and on behalf of Brianne's estate, punitive damages. An award of punitive damages requires conduct that is outrageous because of a defendant's evil motive or as a result of his reckless indifference to the rights of others. *Martin v. Johns-Manville Corp.,* 508 Pa. 154, 170, 494 A.2d 1088, 1096 (1985) (citing Restatement (Second) of Torts §908(2)). In this case, the Rideouts are alleging that the hospital acted with reckless indifference. Punitive damages may be imposed under this prong where "the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious

that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." *Evans v. Philadelphia Transportation Co.,* 418 Pa. 567, 574, 212 A.2d 440, 443 (1965).

At this stage of the pleadings, we must conclude that the Rideouts have alleged facts sufficient to show reckless indifference; specifically, as set forth *supra:* that the hospital knew that it was discontinuing Brianne's life-sustaining support against the Rideouts' desperate opposition; that Dr. Lucking knew the Rideouts were in the hospital trying to obtain legal assistance; that the Rideouts had been assured by the hospital that nothing would be done without them present and that the hospital, in anticipation of an emotional reaction by the Rideouts, had secured the presence of Derry Township police officers. Thus, the hospital's demurrer is overruled.

Accordingly, we enter the following:

## ORDER

And now, December 29, 1995, in consideration of Hershey Medical Center's preliminary objections to the plaintiffs' complaint, it is directed that defendant's demurrers to Counts I, II and XI are hereby overruled. Defendant's demurrers to Counts V, VI, VII and VIII are overruled as to the individual plaintiffs and sustained as to the plaintiff estate. With regard to Count III, to the extent plaintiffs base their allegation on a common-law theory of recovery, defendant's demurrer is overruled as to the plaintiff estate and sustained as to the individual plaintiffs. To the extent the plaintiffs base their allegation in Count III on a state constitutional privacy right, defendant's demurrer is sustained as to all plaintiffs. Defendant's demurrers to Counts IV, IX and X are also sustained. All other objections are dismissed.